IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

LARRY DALE HILTON                                                                      PLAINTIFF

V.                                         NO. 11-03003

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration                    DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying his claim for supplemental security income (SSI) benefits under the provisions of Title XVI of the Social Security Act (Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. § 405(g).

**I.     Procedural Background:**

Plaintiff protectively filed his current application for SSI on October 25, 2007, alleging an inability to work due to depression/nerves/head injury, and back problems. (Tr. 105, 120). An administrative hearing was held on March 26, 2009, at which Plaintiff appeared with counsel and testified. (Tr. 8-38).

By written decision dated October 14, 2009, the ALJ found Plaintiff had the following

-1-

severe impairments: degenerative joint disease of his spine; anxiety; depression and/or bipolar disorder; and alcohol abuse. (Tr. 46). However, after reviewing all of the evidence presented, she determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 47). The ALJ found Plaintiff retained the RFC to perform the exertional requirements of light work, with the following limitations:

> The claimant is further limited and can perform work that involves only occasional postural limitations. Additionally, the claimant has a limited education and can perform only unskilled work, and he can perform work that involves only incidental interaction with others consistent with the work performed. Accordingly, the claimant can do less than the full range of light work.

(Tr. 48-49). With the help of a vocational expert (VE), the ALJ determined Plaintiff could perform other work, such as production assembly, maid work, and eviscerator. (Tr. 53).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on November 19, 2010. (Tr. 1-3). Subsequently, Plaintiff filed this action. (Doc. 1). Both parties have filed briefs and this case is before the undersigned for report and recommendation. (Docs. 7, 8).

## II.    Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F. 3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports

the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§423(d)(3), 1382(3)(D). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing his claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and (5) whether the claimant was able to perform other work in the national economy given his age, education, and experience. See 20 C.F.R. §416.920. Only if the final

stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity (RFC). See McCoy v. Schneider, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §416.920.

### III. Discussion:

Of particular concern to the undersigned is the ALJ's RFC determination. RFC is the most a person can do despite that person's limitations. 20 C.F.R. §404.1545(a)(1). It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own description of his limitations. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "The ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

As early as December 4, 2007, Dr. Terry L. Efird conducted a Mental Diagnostic Evaluation for the Social Security Administration, and noted that Plaintiff did not present information in a clear manner. (Tr. 224). He further noted that Plaintiff's roommate, Jennifer Bogart, was present for the evaluation, and she attempted to respond and/or clarify Plaintiff's responses at times, and that it was a difficult evaluation to conduct. (Tr. 226). He noted that Plaintiff did not present, clarify, or describe information clearly, and that the fund of general

information suggested "probably borderline to possibly low average intellectual functioning." (Tr. 226-27). Dr. Efird reported that he was not able to rule out the possibility of a learning disability, and that further psychometric testing would be required "to establish actual level of intellectual functioning and rule out some type of learning disability." (Tr. 228). He stated that a diagnosis of anxiety disorder, NOS, would be provided to reflect the symptoms of anxiety and depression, but that "providing a clear differential diagnosis in this case appears quite difficult at this time." (Tr. 228). Dr. Efird concluded that Plaintiff did not report information clearly and that clinically, he was not able to rule out the possibility of over-reporting of problem areas: "For example, claimant reported difficulty comprehending information, but was able to comprehend questions and instructions during this evaluation. Formal validity assessment techniques may help to address these types of questions." (Tr. 229).

On February 1, 2008, Plaintiff presented to North Arkansas Medical Center with suicidal ideations. (Tr. 261). He was referred to the Arkansas State Hospital, where he stayed until February 22, 2008. His discharge diagnosis was:

| | |
|---|---|
| Axis I: | Marijuana Abuse <br> Depressive Disorder, NOS |
| Axis II: | None |
| Axis III: | None |
| Axis IV: | Problems with legal system, finances, and occupation |
| Axis V: | GAF 60. |

(Tr. 285). His prognosis was reported as "guarded due to poor coping skills, poor insight into his problems at times, and history of drug abuse." (Tr. 285).

On April 15, 2008, a Psychiatric Evaluation was performed by Dr. Dante Durand, at Ozark Counseling Services, Inc. Dr. Durand found that Plaintiff's short memory was severely

-5-

impaired, his attention was mildly impaired, his concentration was severely impaired, his abstraction capacity was mildly impaired, his fund of knowledge was mildly impaired and his calculations were mildly impaired. (Tr. 315). He further found that Plaintiff's intelligence level seemed to be below average, that his insight into illness was fair, his judgment was mildly impaired, and his impulse control was fair. (Tr. 315). Dr. Durand gave Plaintiff a differential diagnosis as follows:

| | | |
|---|---|---|
| Axis I: | 296.80 | Bipolar Disorder, NOS |
| | R/O 296.89 | Bipolar Disorder |
| | 303.90 | Alcohol Dependence in early full remission |
| | 305.20 | Cannabis Abuse |
| | R/O 314.9 | Attention Deficit Hyperactivity Disorder, NOS |
| | R/O 294.0 | Amnestic Disorder due to Brain Traumatic Injury |
| | 315.9 | Learning Disorder, NOS |
| | 305.1 | Nicotine Dependence |
| Axis II: | V62.89 | Borderline Intellectual Functioning |
| Axis III: | Emphysema, S/P Vertebrae Fracture, unstable left knee, S/P Head Injury | |
| Axis IV: | Issues with primary support, financial difficulties, occupational problems, problems with access to healthcare | |
| Axis V: | GAF 42 | |

(Tr. 315). Dr. Durand wanted to order an IQ testing and a neuropsychological evaluation "to have a better idea of his cognitive capacities and also to differentiate primary cognitive process versus an organic problem that can induce cognitive problems." (Tr. 316).

On April 29, 2008, a Mental Diagnostic Evaluation was conducted by W. Charles Nichols, Psy.D., of The Family Psychological Center, P.A. (Tr. 295-300). In the evaluation, Dr. Nichols noted that Plaintiff "may suffer from cognitive deficiencies (e.g., borderline intellectual functioning) or learning disabilities. However, IQ and achievement testing are needed to confirm or rule out those possibilities." (Tr. 298). Dr. Nichols also reported that Plaintiff's social skills appeared to be primitive and, when combined with his low frustration tolerance, likely would

-6-

generate some conflict or personnel issues in the workplace. (Tr. 299). He noted that Plaintiff responded to the tasks of the interview with poor mental efficiency, and was unable to efficiently track and respond to various types of questions and tasks. (Tr. 299). Dr. Nichols reported that plaintiff did not display signs of psychomotor showing that could be expected to interfere with job-like tasks. However, he noted that in response to mental status/cognitive tasks, the claimant responded with slow pace, which he stated "may be secondary to cognitive deficiencies rather than an affective condition, a hypothesis buttressed by his history of poor academic achievement and alleged functional academic deficits." (Tr. 299). Finally, Dr. Nichols noted that when answering cognitive screening items, Plaintiff seemed to give less than adequate effort, "suggesting that the quality of his responses may not accurately reflect his underlying cognitive/intellectual potential." (Tr. 299). He concluded that the validity of Plaintiff's self-report and assessment was questionable.

On July 25, 2008, Plaintiff again saw Dr. Durand, and although it was reported that Plaintiff was doing much better, Dr. Durand noted that Plaintiff had a seizure on alcohol the prior week, after he became upset with his ex-girlfriend. (Tr. 309).

In a September 10, 2008 report from Ozark Counseling Services, it was noted that Plaintiff had allegedly been using alcohol extensively, and that although he reported compliance, other reports from other resources indicated that he was not compliant. (Tr. 328). The report further stated: "He continues to show limited coping skills. He has not followed through on recommendations. He reports that he doing [sic] well although he has enough complaints to continuing justifying his desire for disability." In a Transfer/Discharge Summary prepared by Ozark Counseling Services, it was reported that Plaintiff's last contact was November 7, 2008,

and that Plaintiff continued to use alcohol extensively; was not attending AA or NA, and that Plaintiff had limited coping skills-marginally/non-compliance with treatment plan or treatment recommendations. (Tr. 332).

In a January 8, 2009 Master Treatment Plan from Health Resources of Arkansas (Ozark Counseling Services closed and reopened as Health Resources of Arkansas), the diagnosis was listed as:

| | |
|---|---|
| Axis I: | Bipolar Disorder, NOS<br>Panic Disorder w/o Agoraphobia<br>Alcohol Dependence in Early Partial Remission |
| Axis IV: | Primary support, social environment, finances, education occupation and access to health care |
| Axis V: | Current GAF - 40 |

(Tr. 352). In the Adult Diagnostic Assessment of the same date, it was noted that Plaintiff described panic attacks 4-5 times per week, with racing heart, feeling out of control, intense anxiety, sweating, and shaking. (Tr. 358). Plaintiff reported being depressed every day, and reported last use of alcohol was in February of 2008. (Tr. 358). This is obviously inconsistent with the July 25, 2008 report indicating Plaintiff had a seizure on alcohol the week prior.[1]

A medical record from Medical Clinic Mission dated January 13, 2009, indicated that Plaintiff reported stopping taking Tramadol three weeks prior thereto because he was "blacking out, hit a car." (Tr. 349).

On February 16, 2009, a report entitled "Initial Psychiatric Evaluation" from Health Resources of Arkansas indicates that Plaintiff presented as "laid back" and generally unconcerned about his current treatment plan. (Tr. 369). It reported that Plaintiff had always

---

[1] At the hearing held on March 26, 2009, Plaintiff testified that he had not had anything to drink that year. (Tr. 21).

gotten medicine free, and thought he would get more medicine that day with the exception of Klonopin, which he bought. It was reported that there was no evidence of anxiety, although the chart reflected a history of it. (Tr. 369). Plaintiff's judgment/insight was reported as "limited" and the report also indicated that he continued to think the clinic would come up with his medicine, despite the explanation that it might not be there. (Tr. 371). At that time, Plaintiff was given a GAF of 40. (Tr. 372).

A report of contact dated May 25, 2010, indicates that Plaintiff said he saw Dr. Durand six months previously due to his "bi-polar and mood swings." (Tr. 176).[2] The report noted that Plaintiff stated he had trouble learning, could not read or write, and that his attorney told him the ALJ was to send him for some aptitude testing, but never did. (Tr. 176).

At the March 26, 2009 hearing, Plaintiff's attorney suggested to the ALJ that the individuals at Ozark Counseling all questioned whether Plaintiff was adequately reporting or appropriately reporting." (Tr. 34). Since he believed there was not a lot of actual objective testing, he asked that Plaintiff be sent for a battery of objective testing, to which the ALJ responded:

> ALJ: I was thinking about that. I was thinking about that because I think that that might be helpful, but recognizing that, you know, we're three for three with regards to questions about his work and his effort at this point, and if it comes up the fourth time, he's sunk himself...But I would also like to see - - that's why I want to see the Ozark records because if Mr. Hilton has been sober since January as he's reporting, I'd like to see what they're saying with regards to his compliance and his symptomatology now also. So, what I prefer to do before we go through all of the effort of sending him out for the testing....I would like to see those Ozark records first and then make a decision because....I would like to see what Ozark says with regards to his self report and symptomatology and his compliance with his medication currently, and with regards to his sobriety...."T]he alcohol, though, seems to be the ongoing issue, and that's what I

---

[2]There is no record of such visit in the transcript.

want to see, and I think more – I think that seems to be the bigger issue for him. Let's just get the Ozark records and see where we're going with regards to that first. Okay?

ATTY:  I will appreciate your considering the testing because I think there are some validation measures greater than just this –

ALJ: Yes, I do agree.  I do agree.  And I – so I – but I would like to see – because if Ozark says that he's being valid and that the issues are there, then I'm not sure that we need to go for that because that may address the validity issue in the mental status exams if they – do you understand where I'm going with this?

ATTY: I understand where you're going.

ALJ: So, I'd rather spend $25.00 getting medical records than, you know, two or three months and several hundred dollars to send him out for that testing. ...
With regards to validity and malingering, I'm actually – give a lot of weight to what the counselor is saying because that's the person who is seeing him all the time.  You know – I mean – It – and in that regard I do - it's not, it's not an RFC.  And even in that I do give weight to what – if you have a counselor who has been seeing somebody on a regular basis, you know, I – you have to weigh that against the fact that it's a counselor versus a physician, and if they're saying that there is a validity there, you know, that his symptoms are valid, and he's been sober and he's been compliant, the person who sees him every week is going to know that more than the doctor who is reviewing the file every three to six months.

(Tr. 34-36).

In her decision, the ALJ stated that there was nothing in the record to warrant intellectual testing.  She also said that even if Plaintiff had borderline intellectual functioning or a learning disorder, "it would not affect his educational level, and that Plaintiff had not shown significant limitations in adaptive functioning that might make him equal section 12.05." (listing for mental retardation).

The Court recognizes that the ALJ did not commit to sending Plaintiff for the cognitive objective testing, but instead said she would consider it after she received more recent reports from Ozark Counseling Services.  However, the Court believes that the fact that Dr. Efird and

-10-

Dr. Durand both recommended further testing (psychometric testing, IQ testing, neuropsychological evaluation) is significant in this case, since such testing would further specifically show objectively whether Plaintiff suffers from mental retardation or a learning disorder. In addition, Dr. Nichols indicated that when answering cognitive screening items, the quality of Plaintiff's responses "may not accurately reflect his underlying cognitive/intellectual potential." Finally, based upon the records now before the Court, it does not appear that Plaintiff drank alcohol in 2009, which appeared to be relevant to the ALJ's decision as to whether additional testing should be conducted.

The Court does not believe that the ALJ can conclusively state that Plaintiff does not suffer from mental retardation or a learning disorder without further objective testing. Once done, the ALJ will then be in a better position to determine Plaintiff's ability to function in the workplace.

Based upon the foregoing, the Court does not believe there is substantial evidence to support the ALJ's RFC findings, and believes that this matter should be remanded to the ALJ in order for her to obtain additional intellectual testing and a neuropsychological evaluation, and then to re-evaluate her RFC assessment.

**IV.   Conclusion:**

Accordingly, the Court recommends that this matter be reversed and remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g). **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that**

AO72A
(Rev. 8/82)

**objections must be both timely and specific to trigger de novo review by the district court.**

IT IS SO ORDERED this 13th day of January, 2012.


/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)